## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **DIEGO RIVERA**, | **CIVIL ACTION** |
| Petitioner, | |
| *v.* | **NO. 20-3990-KSM** |
| **LAUREL HARRY, et al.**, | |
| Respondents. | |

## <u>MEMORANDUM</u>

**Marston, J.**                                              **September 30, 2024**

Diego Rivera is serving a sentence of 30 to 60 years for third-degree murder, robbery, and other offenses.  (Doc. No. 1.)  In August 2020, Rivera filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (*Id.*)  The Court referred this petition to the Honorable Richard A. Lloret, United States Magistrate Judge.  (Doc. No. 3.)  Now before the Court is Judge Lloret's Report and Recommendation ("R&R") (Doc. No. 44), Rivera's objections to the R&R (Doc. No. 45), and the Commonwealth's response to Rivera's objections (Doc. No. 47).  For the reasons set forth below, the Court overrules Rivera's objections, adopts the R&R, and dismisses Rivera's claims with prejudice and without an evidentiary hearing.

## I.      Background

### A.      Factual Background

The Pennsylvania Superior Court recounted the following factual background when ruling on Rivera's direct appeal:

> On September 1, 2012, Christopher Thompson ("Thompson") was "hanging out" on the corner of Rosehill and Somerset streets in Philadelphia selling drugs. Thompson testified that he had been "working that corner" for a couple of months. Thompson was engaged in a drug transaction with a customer when appellant and

an unidentified black man approached him. Thompson described appellant as Puerto Rican. Appellant and his cohort began cursing at Thompson and telling him to "get the F off the block." The black male punched Thompson while appellant hit him over the head with a semi-automatic handgun. They took Thompson's money and drugs and told him to leave. One of them told Thompson, "whoever you are working for, show them I did this to you." "Show them I did this to you and tell them we are coming back in a couple hours." Thompson described appellant as 5'8" to 5'9", in his early 20s with a short beard and a neck tattoo.

Thompson returned to the area a few hours later. Thompson was standing on the corner of Rosehill and Somerset, talking to a girl, when he saw appellant. Appellant was walking toward Thompson, but then crossed the street and walked toward the Yadi Market on Somerset. Shortly thereafter, Thompson heard gunshots and hid behind a car. Thompson peeked through the car window and saw appellant firing shots. Appellant then ran down Rosehill and jumped into a car. After the shooting, Thompson observed the victim, Kareem Tomlin, lying on the ground with blood coming from his head. Thompson gave a statement to police and picked out appellant as the shooter in a photo array. Thompson also identified appellant at trial.

Yahaira Polanco ("Polanco") testified that on September 1, 2012, she was walking up Somerset Street towards her mother's house when she heard gunshots. The shots were coming from the direction of Yadi Market. In a statement to police, Polanco identified appellant as the gunman and picked his photo out of a photo array. Polanco told police that when the shooting started, she grabbed her kids and ran inside her mother's house. Through her mother's door window, Polanco could see appellant firing shots. Afterwards, Polanco went outside and saw the victim lying on the ground bleeding from his head. Polanco identified the victim as Kareem Tomlin, known as "Reem."

Police recovered video surveillance footage from two locations, Yadi Market and also a private residence on Rosehill Street. The video captured appellant's altercation with Thompson as well as appellant running from the scene of the shooting and getting into a white car. The incident with Thompson occurred at 11:21 a.m. on September 1, 2012, and the shooting outside the grocery store occurred at 4:07 p.m. In addition, security cameras captured appellant leaving Coleman Hall, a halfway house, on September 1, 2012. Appellant had a social pass to visit his mother from 10:00 a.m. to 6:00 p.m. Appellant signed out at 9:47 a.m. and never came back.

After he failed to return to the facility by 6:00 p.m. as scheduled and was declared an absconder, counselors discovered that appellant had cleaned out his room. The shift supervisor spoke with appellant's stepfather who said he had not seen appellant that day.

On September 4, 2012, the fugitive task force was assigned to locate and apprehend appellant. A wanted poster was issued with appellant's picture and information. Detectives located appellant on September 9, 2012, but he fled through a bathroom skylight. On September 11, 2012, appellant was apprehended at a different location. During the ten days between the shooting and his apprehension, appellant had covered up the distinctive tattoo on his neck, "Who Wants Gunplay," with another tattoo.

The victim died of a single perforating gunshot wound to his head. The bullet entered through the back of his head and exited out the front, causing extensive injuries to his brain. The trajectory of the bullet was from back to front, right to left, and traveling slightly upward. There was no soot or stipple, meaning that the gun was fired from beyond 2 1/2 feet. Police recovered seven fired cartridge cases, all fired from the same .9 millimeter firearm.[1] Police also recovered two bullets, which were fired from the same .9 millimeter firearm. Police did not find the actual firearm that was used.

*Commonwealth v. Rivera*, No. 1963 EDA 2014, 2016 WL 5844454, at *1–2 (Pa. Super. Ct. Oct. 5, 2016) ("*Rivera I*") (internal citations and footnotes omitted).[2]  The Commonwealth charged Rivera under two dockets: one for the robbery and assault and another for the murder. (Doc. No. 44 at 5.)  The Court's independent review of the record reveals that the Superior Court's recitation of the factual background of this case is accurate.  However, as is relevant to resolving

---

[1] This evidence was elicited from Philadelphia Police Officer Gregory Welsh, who was qualified as an expert in firearms examination and identification.  (N.T. Mar. 12, 2014, at 34.)

[2] Judge Lloret included this same summary of facts in his R&R.  (Doc. No. 44 at 3–5.)  Rivera objected to its inclusion (Objection I), arguing that Judge Lloret failed to consider the totality of the evidence.  (Doc. No. 45 at 1–5.)  However, this section was merely included as background and Judge Lloret proceeded to make his own additional findings of fact later in the R&R when evaluating whether counsel's purported error prejudiced Rivera.  (Doc. No. 44 at 15–20.)  The Court thus finds Rivera's objection inappropriate.  To the extent Rivera is arguing that Judge Lloret failed to consider the totality of the evidence in evaluating his ineffective assistance of counsel claim, we find the issue better resolved later in this Memorandum. *See supra* at �github.

the objections presently before the Court, we provide the following additional details of how trial proceeded.

Rivera's trial began on March 10, 2014.  (*See generally* N.T. Mar. 10, 2014.)  At trial, the prosecution presented the testimony of the two eyewitnesses:  Christopher Thompson and Yahaira Polanco.  (N.T. Mar. 12, 2014, at 122–172, 194–226.)  Thompson, testified to the facts identified above by the Superior Court, including that he was hit by Rivera with a glock-style pistol while being robbed and that he later saw Rivera on the corner of Somerset and Rosehill shooting two shots "up toward Ormes [Street]."  (N.T. Mar. 11, 2014, at 125–27, 135–38, 151.)  Thompson further explained that he provided a statement to officers at the scene and was brought in to be interviewed by the homicide division.  (*Id.* at 139; *see also id* at 118 (the officer Thompson spoke to at the scene testifying that Thompson described the shooter as "a Hispanic male, dark skinned with a full beard, wearing a white wife beater shirt who fled in a white colored car, possibly a Mirage").)  During that interview, Thompson was shown hundreds of photographs of potential suspects in succession through a photo-imaging computer program.  (*Id.* at 140–41.)  Rivera was not included in any of these initial photographs, and Thompson did not identify any photograph as the man he had seen.  (*Id.* at 141; N.T. March 12, 2014, at 174–75.)  Shortly thereafter, however, Thompson was shown a photo array of eight individuals, which did include Rivera.  (N.T. Mar. 11, 2014, at 141–44.)  At this point, Thompson successfully identified Rivera as the shooter.  (*Id.*)  Finally, in his trial testimony, Thompson acknowledged that he faced two sets of criminal charges related to his sale of narcotics.  (*Id.* at 154.)  Thompson had pled "no contest" to these charges and was participating in drug court.  (*Id.* at 159–63.)  However, Thompson denied the notion that he received leniency or any promises from the Commonwealth in exchange for his testimony.  (*Id.* at 154, 160–61.)

The Commonwealth also presented the testimony of Yahaira Polanco, who in an interview with the police the day after the shooting, identified Rivera as the shooter when presented with an array of eight individuals.  (*Id.* at 206, 213.)  However, she testified at trial that she did not recall what the shooter looked like, that she didn't recall identifying Rivera to the police, and that officers forced her to pick a photo before she was allowed to leave.  (*Id.* at 202, 204–07, 218.)  The Commonwealth thereafter established that Polanco still lived in the neighborhood of the shooting, that she was afraid to testify against Rivera, and that she did not want to be a witness.  (*Id.* at 208–09.)  The Commonwealth was thus permitted to admit Polanco's statement to police as substantive evidence.  (*Id.* at 239–44.)

In addition to the two eyewitnesses, the Commonwealth elicited testimony from Ashley Maldonado, an individual who lived near the scene of the shooting and arrived shortly after Tomlin was shot.  (*Id.* at 88, 93, 96.)  Maldonado testified that she did not see the shooter but heard shots from the direction of the store.  (*Id.* at 91–93, 96.)  She left her apartment and rushed to Tomlin's body, holding his head.  (*Id.* at 94.)  While there, she heard a group of people in the middle of the street say that a "black guy" was the shooter.  (*Id.* at 97, 108.)  She also heard this crowd say that the shooter was wearing a white shirt.  (*Id.* at 103–04, 108.)  However, when the Commonwealth pressed this issue, Maldonado testified that she "may or may not have heard" what the group had to say because she "wasn't paying attention . . . [or] really listening" and was instead focused on helping Tomlin.  (*Id.* at 98–99.)

The Commonwealth also introduced the testimony of Detective Dunlap, a video technician at the Philadelphia Police Department who assembled a composite videotape of the shooting and robbery.  (N.T. Mar. 12, 2014, at 103–05.)  Dunlap was qualified as an expert forensic video technician, premised on his specialized training in digital imaging video collection

from the Federal Bureau of Investigation and the Philadelphia Police Department, his seven years with the Philadelphia Police Department, his experience of recovering videos at over 500 crime scenes, and the fact that he had previously been qualified as an expert in both state and federal cases.  (*Id.* at 106–07.)  Dunlap described how he arrived at the scene three hours after the murder and collected video of the shooting from the corner grocery store and a nearby private residence.  (*Id.* at 111–19; *see also* 107–10 (Dunlap explaining how he generally retrieves video from a scene).)  He explained that due to power outages and other battery-related issues, he needed to correct the time stamps on the video, which he did using the U.S. Naval Observatory Master Clock.  (*Id.*)  The day after the shooting, Dunlap returned to the scene to retrieve footage of Rivera's robbery of Thompson and similarly adjusted the time stamps on the video.  (*Id.* at 119–20.)  In anticipation of trial, Dunlap generated a video compilation from the footage he retrieved from these sources.  (*Id.* at 124.)  Dunlap testified that the videos he retrieved were in a "proprietary format" that required them to be played with a particular player and prevented the videos from being altered without it becoming "extremely apparent."  (*Id.* at 122.)  And he used software called Tech-Smith to create the compilation.  (*Id.* at 122–23.)

Detective Dunlap played the video compilation for the jury, periodically drawing the jury's attention to particular aspects of what was being shown.  (*Id.* at 124–153.)  As noted in the Superior Court's summary, the videotape showed a man in a white shirt and acid-washed jeans (Rivera) assaulting and robbing Thompson on the morning of September 1, 2012.  (*Id.* at 131–36.)  It then showed Thompson, later that day, hiding behind a car.  (*Id.* at 142–46.)  Finally, the video showed the same man in acid-washed jeans (Rivera) firing two shots before fleeing.  (*Id.*)  Earlier that day, Andrea Harris—who was the operations manager in charge of security at the halfway house in which Rivera resided—testified that she saw Rivera wearing the same

6

distinctive pair of acid-washed jeans and authenticated a video showing Rivera in a yellow shirt and those jeans when leaving the halfway house at 9:47 a.m. (N.T. Mar. 12, 2014, at 71–78.) Dunlap testified that he received this video from Coleman Hall, reviewed it, and created still photographs from it. (*Id.* at 146–47.) The jury was shown these still photographs next to still photos from Yadi Market, both of which showed an individual wearing distinctive acid-washed jeans. (*Id.* at 147–48.)

On March 13, 2014, the jury found Rivera guilty of third-degree murder, robbery, aggravated assault, criminal conspiracy, carrying a firearm without a license, carrying a firearm in public in Philadelphia, and possession of an instrument of crime. (N.T. Mar. 13, 2014, at 152–55.) On June 13, 2014, the trial court sentenced Rivera to 30 to 60 years of incarceration. (N.T. June 13, 2014, at 38–39.)

### B.     Procedural History

#### 1.     Direct Appeal Proceedings

Rivera filed a post-sentence motion on June 25, 2014, which the court denied two days later as untimely. *Rivera I*, 2016 WL 5844454, at *2. Rivera then timely filed an appeal on July 9, 2014 and was appointed counsel. *Id.* at *3. On April 13, 2016, Rivera's counsel submitted a no-merit brief pursuant to *Anders v. California*, 386 U.S. 738 (1976) and filed an application to withdraw. *Id.* at *3. A few months later, on October 5, 2016, the Pennsylvania Superior Court affirmed Rivera's sentence after determining that the issues he raised on appeal were meritless. *Rivera I*, 2016 WL 5844454, at *7. Rivera did not appeal the Superior Court's decision to the Pennsylvania Supreme Court.

### 2.    *State Habeas Proceedings*

On August 31, 2017, Rivera filed a timely pro se petition for post-conviction collateral

relief under Pennsylvania's Post Conviction Relief Act ("PCRA").  (Doc. No. 44 at 6.)  He

raised, among other things, a claim that his trial counsel was "ineffective for failing to conduct

an independent investigation."  (N.T. July 24, 2018, at 9–10.)  On December 14, 2017, the PCRA

court appointed Rivera counsel, who, on May 11, 2018 filed a no merit letter pursuant to

*Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988) and *Pennsylvania v. Finley*, 481 U.S. 55

(1987) and requested permission to withdraw.  (Doc. No. 44 at 6.)  The PCRA Court conducted a

brief hearing on July 24, 2018 to address counsel's no merit letter.  *See Commonwealth v. Rivera*,

Nos. CP-51-CR-0013542-2012, CP-51-CR-13543-2012 (PCRA Op. Dec. 11, 2018)

("*Rivera II*").  As to his ineffective assistance of counsel claim related to his counsel's

investigation, the PCRA court found as follows:

> [Rivera] gives no factual basis or hypothesis as to how there's no
> independent investigation in the case. He cites no facts upon which
> this Court can rule. He claims that Mr. Stosic did not call witnesses,
> but he does not name any of the alleged witnesses. He does not state
> what testimony these witnesses would've offered to support his
> defense. Therefore, this issue lacks merit.

(N.T. July 24, 2018, at 9–10.)  Following the hearing, the PCRA Court sent Rivera a notice

pursuant to 234 Pa. Code Rule 907, which required a response within 20 days.[3]  (*Id.*)

---

[3] Rule 907 states:

> (1) the judge shall promptly review the petition, any answer by the attorney
> for the Commonwealth, and other matters of record relating to the
> defendant's claim(s). If the judge is satisfied from this review that there
> are no genuine issues concerning any material fact and that the defendant
> is not entitled to post-conviction collateral relief, and no purpose would be
> served by any further proceedings, the judge shall give notice to the parties
> of the intention to dismiss the petition and shall state in the notice the
> reasons for the dismissal. The defendant may respond to the proposed
> dismissal within 20 days of the date of the notice. The judge thereafter

On August 16, 2018, Rivera filed a response to the Rule 907 notice, but was informed by the court that it was untimely and would not be accepted.  (Doc. No. 44 at 6 (citing *Rivera II*, at 2 n.7).)  The PCRA court thus dismissed Rivera's PCRA petition on August 21, 2018.  (*Id.*)  The court submitted a short opinion on December 11, 2018, which attached the July 24, 2018 hearing transcript, and provided that Rivera's petition lacked merit.  *See Rivera II*.

Rivera appealed on September 19, 2018, raising eight grounds for relief, including that his "[t]rial counsel was ineffective for failing to conduct an independent investigation [of the composite videotape]."  (Doc. No. 44 at 6.)  But because Rivera only filed one notice of appeal—even though his convictions were on two separate dockets—the Superior Court quashed the appeal on March 10, 2020 pursuant to *Commonwealth v. Walker*, 185 A.2d 969 (Pa. 2018).  *See Commonwealth v. Rivera*, No. 2784 EDA 2018, 2020 WL 1158711, at *2 (Pa. Super. Ct. Mar. 10, 2020) ("*Rivera III*").  Rivera did not seek discretionary review from the Pennsylvania Supreme Court.  (Doc. No. 44 at 7.)

### 3.    *Federal Habeas Proceedings*

On July 11, 2020, Rivera, proceeding pro se at the time, filed a petition for habeas corpus with this Court under 28 U.S.C. § 2254.  (Doc. No. 1.)  Rivera's petition sought a new trial on three grounds.  (*Id.*)  First, Rivera argued that his trial counsel was ineffective for (a) failing to independently investigate the composite videotape presented at his trial, (b) failing to file a motion to sever his robbery and assault case from his murder case, (c) failing to object to prosecutorial remarks during opening and closing arguments, (d) failing to move for a mistrial, and (e) forcing Rivera not to testify at trial.  (*Id.* at 7.)  Second, Rivera argued that his appellate

---

shall order the petition dismissed, grant leave to file an amended petition, or direct that the proceedings continue.

counsel was ineffective for failing to raise that trial counsel was ineffective.  (*Id.* at 9.)  Finally, Rivera argued that his PCRA hearing was not "full and fair."  (*Id.* at 11.)

On August 25, 2020, the Court referred this matter to Magistrate Judge Lloret for an R&R (Doc. No. 3), which Judge Lloret issued on May 10, 2021 (Doc. No. 11).  In his R&R, Judge Lloret first concluded that Rivera's habeas petition was untimely under the Antiterrorism and Effective Death Penalty Act's statute of limitations and that Rivera was not entitled to equitable tolling.  (*Id.* at 7–10.)  Judge Lloret further reasoned that, even assuming Rivera was entitled to equitable tolling, his two ineffective assistance of counsel claims were procedurally defaulted because the Pennsylvania Superior Court rejected these claims on independent and adequate state procedural grounds under *Walker*.  (*Id.* at 10–14.)  Finally, Judge Lloret found that Rivera's claim that the PCRA hearing was not "full and fair" was non-cognizable because it "does not assert a violation of any federal right."  (*Id.* at 15.)  Judge Lloret therefore recommended that the Court dismiss Rivera's claims with prejudice and without an evidentiary hearing.  (*Id.* at 16.)

Rivera, still proceeding pro se, objected to the R&R on May 26, 2021.  (Doc. No. 13.)  On July 30, 2021, Rivera retained counsel.  (Doc. No. 16.)  Through counsel, Rivera filed supplemental objections to the R&R on August 13, 2021, (Doc. No. 20), which the Commonwealth responded to on November 1, 2021 (Doc. No. 24).

On January 10, 2021, this Court partially adopted and partially rejected Judge Lloret's R&R.  (Doc. No. 27.)  While the Court agreed that Rivera's third claim was non-cognizable for failing to assert a federal right, the Court declined to adopt the R&R as it pertained to Rivera's ineffective assistance of counsel claims.  (*Id.*)  First, the Court held that Rivera was entitled to equitable tolling because of the prison's restrictions during the COVID-19 pandemic.  (*Id.* at 9–

11.)  Next, the Court held that although Rivera's claims were procedurally defaulted after the

Pennsylvania Superior Court quashed his September 2018 appeal pursuant to *Walker*, this did not

bar habeas review because the *Walker* rule was both short-lived and inconsistently applied.  (*Id.*

at 12–15.)  The Court remanded the case back to Judge Lloret, instructing him to determine

whether the Court should hold an evidentiary hearing.  (Doc. No. 28.)

On January 19, 2022, Judge Lloret ordered the Commonwealth to provide Rivera with

the composite videotape played at his trial and for both parties to submit a joint status report.

(Doc. No. 30.)  Judge Lloret also ordered Rivera to submit a counseled memorandum of law in

support of his petition within 30 days of receiving the videotape discussing "all 'merits' issues"

and for the Commonwealth to file a responsive memorandum 30 days after that.  (*Id.* at 1.)

On August 1, 2022, Rivera filed his amended memorandum.  (Doc. No. 38.)  Rivera's

amended memorandum focused exclusively on his first ineffective assistance of trial counsel

claim, which asserts that his trial counsel was ineffective for failing to investigate the composite

videotape and hire an expert in the "creation and interpretation of composite videotapes."  (*Id.* at

8.)  In addition to arguing that his trial counsel was ineffective, Rivera also argued that he is

entitled to relief under *Brady v. Maryland*, 373 U.S. 83 (1963) because the Commonwealth

suppressed the composite videotape played at his trial.  (Doc. No. 38 at 9–11.)  Finally, Rivera

argued that the Court should grant him habeas relief because he is actually innocent of the

offenses for which he was convicted.  (*Id.* at 11–12.)

Judge Lloret issued his second R&R on August 31, 2023, once more recommending that

the Court dismiss Rivera's claims with prejudice and without an evidentiary hearing.  (Doc. No.

44.)  As to Rivera's claim that his trial counsel was ineffective for failing to investigate the

videotape, Judge Lloret recommended that the Court dismiss the claim on three grounds.  First,

Judge Lloret reasoned that given the weight of the evidence against him, Rivera could not show that his trial counsel's failure to investigate the videotape amounted to prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984).  (Doc. No. 44 at 11–18.)  Second, and in the alternative, Judge Lloret reasoned that Rivera's claim failed at the prejudice prong because he failed to explain "how an expert could have helped [him] at trial" other than an "unexplained assertion that the jury could not possibly understand the videotape without a defense expert."  (*Id.* at 18–19.)  And finally, Judge Lloret found that Rivera's ineffective assistance of counsel claim failed the deficient performance prong under *Strickland*, reasoning that "[h]iring an expert to further explain how the composite videotape was created and how the timestamps were adjusted would add nothing to Mr. Rivera's defense, and 'an attorney need not pursue an investigation that would be fruitless.'"  (Doc. No. 44 at 23 (citing *Harrington v. Richter*, 562 U.S. 86, 108 (2011) (alterations accepted)).)

Judge Lloret also recommended that the Court dismiss Rivera's newly added *Brady* claim, reasoning that (1) the composite videotape was not exculpatory, (2) the Commonwealth gave Rivera's trial counsel a copy of the videotape months before his trial, and (3) Rivera was not prejudiced.  (*Id.* at 25.)  And finally, Judge Lloret recommended that the Court dismiss Rivera's "actual innocence" claim since Rivera introduced "no new evidence that was not presented at trial" as is required to support an actual innocence claim.  (*Id.* at 27.)

Rivera filed timely objections to Judge Lloret's R&R on September 14, 2023, focusing on Judge Lloret's conclusions as to Rivera's ineffective assistance and *Brady* claims.  (Doc. No. 45.)  These sweeping and overlapping objections broadly fall into three buckets.  (*Id.*)  The first group of objections—objections I and XII—center around Judge Lloret's finding that Rivera's trial counsel's performance was not deficient.  (*Id.* at 1, 14.)  The second group of objections—

objections III, IV, VI,[4] VII, VIII, IX, and XI—focus on Judge Lloret's conclusion that any ineffectiveness on the part of Rivera's trial counsel did not prejudice him.[5]  (*Id.* at 6–11, 13–14.)  Finally, in objections X and XIII , Rivera objects to Judge Lloret's conclusion that Rivera's *Brady* claim is meritless.  (*Id.* at 11–13, 15.)

Following an Order from the Court (Doc. No. 46), the Commonwealth responded on October 6, 2023, arguing that the Court should overrule Rivera's objections and adopt the R&R. (Doc. No. 47.)

## II.      Standards of Review

### A.      Standards Governing Review of a Magistrate Judge's R&R

"In the Eastern District of Pennsylvania, Local Rule 72.1.IV(b) governs a petitioner's objections to a magistrate judge's report and recommendation."  *Piasecki v. Ct. Com. Pl. of Bucks Cnty.*, Civil Action No. 14-7004, 2021 WL 1105338, at *3 (E.D. Pa. Mar. 23, 2021). Under that Rule, a petitioner must "specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections."  *Id.*

---

[4] There is no objection V.

[5] In particular, along with objecting to the entirety of Judge Lloret's prejudice analysis (Objection III), Rivera asserts that Judge Lloret failed to consider the totality of the evidence (Objection IV); failed to consider certain forensic evidence (Objection VI); erred in considering the prosecution's explanation for Polanco recanting her identification of Rivera and in failing to reference Maldonado's testimony (Objection VII); erred in claiming that the videotape was properly obtained, properly authenticated, and properly provided to the defense in advance of trial (Objection IX); and erred in concluding that the evidence against Rivera was "overwhelming" (Objection XI).  In addition, Rivera objects to Dunlap and Harris's testimony.  (Objection VIII).  The Court finds that all these objections relate to Judge Lloret's prejudice analysis and therefore rise and fall with that claim.

(quoting *Savior v. Superintendent of Huntingdon SCI*, No. 11-cv-5639, 2012 WL 4206566, at *1 (E.D. Pa. Sept. 20, 2012)).

When a party objects to a magistrate judge's findings, the district court must make "a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *United States v. Raddatz*, 447 U.S. 667, 673 (1980). "*De novo* review is non-deferential and generally permits the district court to conduct an 'independent review' of the entire matter." *Piasecki*, 2021 WL 1105338, at *3. "Although review is *de novo*, [a district judge] [is] permitted, by statute, to rely upon the magistrate judge's proposed findings and recommendations to the extent [the judge], in the exercise of sound discretion, deem[s] proper." *Owens v. Beard*, 829 F. Supp. 736, 738 (M.D. Pa. 1993) (citing *Raddatz*, 477 U.S. at 676). After reviewing the magistrate judge's conclusions, the district court may "accept, reject, or modify, in whole or in part, the findings or recommendations" and "receive further evidence, or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1); *Raddatz*, 447 U.S. at 673–74.

"Objections which merely rehash an argument presented to and considered by a magistrate judge are not entitled to *de novo* review" and should be overruled. *Gray v. Delbiaso*, Civil Action No. 14-4902, 2017 WL 2834361, at *4 (E.D. Pa. June 30, 2017); *see also Prout v. Giroux*, Civil Action No. 14-3816, 2016 WL 1720414, at *11 (E.D. Pa. Apr. 29, 2016) ("Where objections do not respond to the Magistrate's recommendation, but rather restate conclusory statements from the original petition, the objections should be overruled."). Also, where a petitioner fails to "identify with specificity any legal or factual errors in the R&R," the R&R is reviewed for clear error. *Lee v. Houtzdale SCI*, 798 F.3d 159, 162 (3d Cir. 2015); *see also Kennedy v. Borough of Minersville*, No. 3:19-CV-0124, 2019 WL 4316218, at *1 (M.D. Pa. Sept.

11, 2019) ("In particular, Plaintiff does not take issue with the substance of any of the Magistrate Judge's conclusions and/or recommendations.  As such, the Report and Recommendation is reviewed for clear error, and finding none, it will be adopted."); *Guzman v. Rozum*, No. CV 13-7083, 2017 WL 1344391, at *9 (E.D. Pa. Apr. 12, 2017) (explaining that "federal district courts are not required to engage in de novo review of objections to a Magistrate's R&R that lack specificity").

### B.    Standards Governing Review of a  § 2254 Petition

A federal court's authority to issue habeas corpus relief for persons in state custody is restricted by the 1996 Antiterrorism and Effective Death Penalty Act's ("AEDPA") amendment to 28 U.S.C. § 2254.  The AEDPA prohibits federal courts from granting habeas relief for claims adjudicated on the merits in state courts unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.  § 2254(d).  But, where, as is the case here, the state court does not issue a merits decision as to a particular claim, the deference set forth in the AEDPA does not apply.  *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).[6]  Instead, the Court conducts *de novo* review.  *See Cone v. Bell*, 556 U.S. 449, 472 (2009) ("Because the Tennessee courts did not reach the merits of Cone's Brady claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to any claim that was adjudicated on the merits in State court proceedings.  Instead, the claim is reviewed *de novo*." (citation omitted)).  Still, the Court presumes that the state courts' factual

---

[6] As noted above, in addressing Rivera's PCRA counsel's no merit letter, the PCRA court ruled that Rivera's claim that his trial counsel was "ineffective for failing to conduct an independent investigation," was meritless.  (N.T. July 24, 2018, at 9–10.)  However, because the Pennsylvania Superior Court did not rule on the merits of this claim, out of an abundance of caution, the Court will apply *de novo* review.

determinations are correct unless rebutted by clear and convincing evidence. *Breakiron v. Horn*, 642 F.3d 126, 131 (3d Cir. 2011).

## III.   Discussion

As discussed above, Rivera's objections focus on two of the claims set forth in his amended memorandum:  (1) his claim that his trial counsel was ineffective for failing to investigate the composite videotape and hire an expert "in the creation and interpretation of composite videotapes" (Doc. No. 38 at 9), and (2) his claim that the Commonwealth's failure to preserve the composite videotape opens it up to sanctions and entitles him to relief under *Brady* (*id.* at 9–11.)  The Court addresses Rivera's objections to these claims before reviewing the remaining portion of the R&R, which recommended dismissal of Rivera's actual innocence claim and to which Rivera did not object, for clear error.

### A.   Ineffective Assistance of Trial Counsel

The Court begins with Rivera's ineffective assistance of trial counsel claim.[7]

#### 1.   *Legal Standard*

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.

---

[7] In his original petition Rivera raised additional ways in which his trial counsel was ineffective, namely by failing to file a motion to sever his robbery and assault case from his murder case, failing to object to prosecutorial remarks during opening and closing arguments, failing to move for a mistrial, and forcing Rivera not to testify at trial.  (Doc. No. 1.)  However, Rivera did not discuss these claims when Judge Lloret called for briefing on "all merits issues" after the Court remanded this matter back to Judge Lloret. (*See* Doc. No. 30 (quotation marks omitted); Doc. No. 38.)  Thus, Judge Lloret's R&R treats these additional ineffective assistance claims as waived and no longer a part of this case.  (Doc. No. 44.) Because Rivera did not object to Judge Lloret's characterization of his ineffective assistance of trial counsel claims, the Court is not required to determine *de novo* whether Judge Lloret erred in disregarding these claims and instead reviews that decision for clear error.  *See Medina v. Diguglielmo*, 461 F.3d 417, 426 (3d Cir. 2006) (noting that "a district court is not required to determine de novo whether a magistrate judge erred in failing to consider a claim in his or her report and recommendation if no objection was made by a party on that ground" and finding a claim raised in a pro se petition that was not reasserted by counsel was waived).)  And the Court finds no such error here.

Nonetheless, the Sixth Amendment "does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013) (citation omitted). To show that counsel was constitutionally ineffective under the Sixth Amendment, a defendant must show:  (1) "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687; *see also United States v. Booth*, 432 F.3d 542, 546 (3d Cir. 2005) ("[A] criminal defendant may demonstrate that his representation was constitutionally inadequate by proving: (1) that his attorney's performance was deficient, i.e., unreasonable under prevailing professional standards; and (2) that he was prejudiced by the attorney's performance.").

Under the first prong, counsel's performance was deficient if they "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The broad phrase "effective assistance" encompasses counsel's "overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id.* at 688.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

Under the second prong, the defendant establishes prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  In other words, an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.  In making this determination, courts "must consider the totality of the evidence before the judge or jury." *Id.* at 695.

The Third Circuit has "endorsed the practical suggestion in *Strickland* to consider the prejudice prong before examining the performance of counsel prong 'because this course of action is less burdensome to defense counsel.'" *Booth*, 432 F.3d at 546 (quoting *United States v. McCoy*, 410 F.3d 124, 132 n.6 (3d Cir. 2005)).

## 2.    *Analysis*

In his R&R, Judge Lloret recommends that the Court dismiss Rivera's ineffective assistance of trial counsel claim, finding that Rivera failed to satisfy either prong of *Strickland*. (Doc. No. 44 at 11–24.) As to the prejudice component, Judge Lloret specifically found: (1) Rivera failed to meaningfully explain how additional investigation from his counsel or the testimony of an expert would have helped him at trial; and (2) the evidence against Rivera outside of this video compilation was overwhelming. (Doc. No. 44 at 11–19.) Rivera broadly objects to both findings. (Objections I, III, IV, VI, VII, VIII, IX, XI, and XII). (Doc. No. 45.) The Court analyzes both components of Judge Lloret's prejudice analysis below and finds they are supported by the record. And since Rivera's claim is "impaled" on the prejudice prong, the Court begins and ends its analysis there. *Wells v. Petsock*, 941 F.2d 253, 260 (3d Cir. 1991); *Strickland*, 466 U.S. at 697.

First, Judge Lloret found that Rivera has not presented any non-conclusory argument as to the effect additional investigation or an expert would have had on his trial. (Doc. No. 40 at 18–19.) The Court agrees. In his amended memorandum, reply brief, and objections, Rivera repeatedly states in conclusory fashion that trial counsel's failure to investigate the videotape and hire an expert "corrupted the entire trial process and caused substantial prejudice" and that it was "impossible for the jury to understand [the video] unless defense counsel hired a defense expert in the creation and interpretation of composite videotapes and had the software required to

understand the composite videotapes." (Doc. No. 38 at 8–9, 12; Doc. No. 42 at 12, 17; Doc. No. 45 at 5.)  But at no point has Rivera articulated to what this purported expert would testify, who this purported expert would be, how the absence of an expert corrupted Rivera's trial, or why this video was indecipherable for the jury without the help of a defense expert.

In his objections to the R&R, Rivera claims for the first time that "[w]ith the testimony of a true expert, the defense had a viable argument that Dunlap manipulated the evidence" and that "the composite videotape was not properly authenticated." (Doc. No. 45 at 11.)  Even setting aside that these arguments were not presented to Judge Lloret and are therefore waived, *see Kightlinger v. Pennsylvania*, No. 11-936, 2013 WL 4504382, at *2 (W.D. Pa. Aug. 22, 2013) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived." (citing *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996)), Rivera has not explained how Dunlap manipulated the video,[8] what testimony an expert would provide to support such a conclusion, or how this video was not properly authenticated.[9]  These types of "vague and conclusory allegations" are insufficient to satisfy *Strickland*.  *See Zettlemoyer v.*

---

[8] To the extent that Rivera is asserting that Dunlap manipulated the video to Rivera's detriment by simply adjusting the time stamp to account for the camera's loss of power, the Court finds that argument to be without merit.  As Judge Lloret found, the "issue of the timestamps is irrelevant" and a "defense expert testifying that the timestamps were incorrect would have no impact on the jury's decision."  (Doc. No. 44 at 20.)

[9] Rivera's newfound arguments are also belied by the record.  As to the authentication argument, the record reflects that Dunlap testified extensively about how he obtained the videos, updated the time stamps, and combined these videos into a single compilation.  (N.T. Mar. 12, 2014, at 111–19.)  This testimony was certainly sufficient to meet the "low burden of proof" for authentication under Pennsylvania law.  *See Commonwealth v. Miller*, No. 1106 WDA 2018, 2019 WL 2406700, at *3 (Pa. Super. Ct. June 7, 2019) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.  Testimony of a witness with knowledge will satisfy that requirement.  (citations and quotation marks omitted)).  And contrary to Rivera's assertion that Dunlap manipulated the videos in some meaningful way, Dunlap testified that because the video removed from the scene is maintained in a proprietary form, he "can't go in and alter the video without it becoming extremely apparent."  (N.T. Mar. 12, 2014, at 122.)

*Fulcomer*, 923 F.2d 284, 298 (3d Cir. 1991) (finding that the petitioner could not meet the *Strickland* standard "based on vague and conclusory allegations that some unspecified and speculative testimony might have established his defense" and must instead "set forth facts to support his contention"); *McDaniel v. Sorber*, No. CV 21-738, 2022 WL 4988167, at *10 (E.D. Pa. Aug. 22, 2022) ("McDaniel fails to identify any specific witness or expert that his trial counsel failed to call or what such a witness could establish.  Under the circumstances, defense counsel cannot be considered ineffective."); *Foster v. United States*, No. CR 15-21-RGA, 2022 WL 2291199, at *6 (D. Del. June 24, 2022) ("To the extent Movant blames counsel's failure to retain a Taser expert on expense or counsel's failure to investigate, his vague unsupported assertions are insufficient to satisfy either prong of the Strickland standard."); *United States v. Lynn*, No. CR 09-279, 2014 WL 7408698, at *5 (W.D. Pa. Dec. 30, 2014) ("Petitioner's vague averments that expert witnesses could have put various documents 'in their proper context,' or that expert witnesses could have testified that he was not involved in a true 'Ponzi scheme,' are simply insufficient to show prejudice in this case.").  Thus, the Court agrees with Judge Lloret's conclusion that Rivera has failed to satisfy the *Strickland* standard.

Second, after an extensive review of the record, Judge Lloret found that the weight of the evidence independent of the video was so strong that any of counsel's shortcomings as to investigating the video did not prejudice Rivera.  (Doc. No. 44 at 11–18.)  Put another way, Judge Lloret concluded that "the composite videotape was corroborative of witness testimony, not the key to the Commonwealth's case, as argued by Petitioner."  (*Id.* at 18.)  Rivera objects to this finding and asserts that Judge Lloret failed to properly consider the totality of the evidence, ignored significant evidence that was in his favor, and incorrectly concluded that the evidence against Rivera was "overwhelming."  (Doc. No. 45 at 2, 9, 13 (objections III, IV, VI, VII, XI).)

In particular, Rivera appears to argue that Judge Lloret failed to properly consider the five

following deficiencies in the Commonwealth's evidence:

> (1) Christopher Thompson, the only witness to the first robbery assault, had several convictions for selling heroin, he testified that he saw a Puerto Rican man firing a gun, but did not see what direction he was firing the gun. He did not see Rivera shoot Kareem. He did not identify Petitioner from photos the first time.

> (2) Ashley Maldonado testified that independent observers who saw the shooting of Kareem, stated that a black man wearing a white shirt shot Kareem.

> (3) Yahaira Polanco, disavowed her statement identifying Rivera as the shooter.

> (4) When Rivera signed out of the half-way house at 9:45 a.m., he was wearing a yellow shirt and jeans.

> (5) According to the testimony of witnesses and P.O Hilbert, Rivera was standing 69 yards from the point where the 7 shell casings were found. If both facts are true, then the distance between Rivera and Kareem is circumstantial evidence that someone else was the shooter because a handgun is not capable of firing a bullet 69 yards.

(Doc. No. 38 at 7–8; Doc. No. 42 at 11–12; Doc. No. 45 at 4–5, 7.)

Based on the Court's careful and independent review of the record, we find that Judge

Lloret's summation of the evidence against Rivera was accurate, that he appropriately weighed

that evidence, and that his conclusion that the evidence outside of the video prevents a finding of

prejudice is well founded. While the Court will not retrace all of Judge Lloret's detailed

analysis, at a high-level and as is detailed above, *see supra* at ▯▯, the compelling evidence

against Rivera consisted of two eyewitnesses identifying Rivera shortly after the incidents (N.T.

Mar. 11, 2014, at 122–172; 239–44), testimony from Thompson that earlier in the day, Rivera hit

him over the head with a glock-style pistol (*id.* at 126–27), ballistics evidence suggesting that the

seven fired cartridge cases found at the scene were all fired from the same gun, as were the two

bullets found at the scene (N.T. Mar. 12, 2014 at 13–14, 55–56), and evidence of Rivera's attempts to flee and cover up his distinctive "Who Wants Gunplay" neck tattoo between the shooting and his arrest (*id.* at 82–85, 162–66). The Court thus finds, as Judge Lloret did, that the evidence against Rivera outside of the video compilation was sufficiently strong such that any failure of counsel to adequately investigate the video or retain an expert was harmless.

The evidence Rivera claims Judge Lloret failed to consider does not compel a different result. As initial matter, the Court finds that the purported deficiencies in the testimony of Christopher Thompson—the victim of the robbery and eyewitness to the shooting—that Rivera relies on are largely unsupported by the record. First, contrary to Rivera's assertion that Thompson "did the not see what direction he was firing gun," (Doc. No. 45 at 4, 7), Thompson in fact testified that he saw Rivera aiming "[u]p toward Ormes [Street]" (N.T. Mar. 11, 2014, at 151). Although Thompson was not able to provide more specific testimony as to where Rivera aimed, such as whether he was aiming across or down the street, Thompson's testimony sufficiently indicated that Rivera fired his second round of shots in the direction of the victim. (*Id.* at 137–38, 154; *see also id.* at 93, 106 (Maldonado testifying that she ran toward Ormes street where she found Tomlin's body).) Second, Rivera asserts that Thompson "did not identify [Rivera] from photos the first time." (Doc. No. 45 at 4, 7.) But as the testimony of the officer who interviewed Thompson made clear, Rivera's photo *was not included* in the set of images Thompson first reviewed. (N.T. March 12, 2014, at 174–75.) Thus, if anything, Thompson's failure to identify the shooter when reviewing this first set of photographs provides additional weight to his eventual identification. And finally, Rivera claims that Judge Lloret failed to consider that Thompson had several convictions for selling heroin. (Doc. No. 45 at 4, 7.) But Rivera does not explain the significance of this fact and the Court notes that Thompson made

clear that he was not receiving any deals or promises from the Commonwealth in exchange for his testimony.  (N.T. Mar. 11, 2014, at 154, 160–61.)

Rivera is certainly correct that there is some evidence in the record pointing in his favor. This includes Maldonado's testimony that she heard some unknown individuals claim that the Tomlin's shooter was a black man (*id.* at 97, 108), that Polanco recanted her identification of Rivera at trial (*id.* at 202, 204–07, 218), that Rivera was seen on camera earlier in the day wearing a yellow shirt whereas the shooter was seen wearing a white shirt (N.T. Mar. 12, 2014, at 71–78), and that the shell casings were found 69 yards away from Tomlin's body[10] (N.T. Mar. 12, 2014, at 26).  But this evidence was successfully limited by the Commonwealth at trial. First, Maldonado testified that she did not see who shot the gun and that she "may or may not have heard" what the group of individuals said because she "wasn't paying attention" to their comments and was instead trying to assist Tomlin.  (*Id.* at 96, 98–99.)  Second, regarding Polanco's recanting of her identification, the Commonwealth elicited testimony that Polanco was afraid to testify in a murder trial because she lived in the neighborhood where the shooting occurred.[11]  (*Id.* at 208–09.)  The Commonwealth also successfully introduced as substantive evidence Polanco's police interview, in which she identified Rivera as the shooter.  (*Id.* at 208–09, 239–44.)  Third, although Rivera may have been seen wearing a yellow shirt while at

---

[10] The Court notes that Rivera incorrectly asserts that the shell casings were found 69 yards from Rivera (Doc. No. 45 at 4), but they were in fact found 69 yards from Tomlin's body (N.T. Mar. 12, 2014, at 26). The Court assumes this was a typographical error.  However, this error is particularly troubling given that Judge Lloret pointed out this same exact error in his R&R after Rivera included the same language in his amended memorandum.  (Doc. No. 44 at 26–27.)  Counsel should endeavor to be more diligent in the future.

[11] Rivera objects that the "prosecutor's explanation for Ms. Polanco's failure to identify petitioner should be disregarded."  (Doc. No. 45 at 9–10 (Objection VII).)  But Rivera provides no explanation as to why the evidence elicited by the prosecution should not be considered.  The Court finds no merit to this bald and conclusory argument.  Thus, this objection is overruled.

Coleman Hall, the probative value of this evidence is limited given that Rivera could have simply removed his yellow shirt after leaving the facility.  (N.T. Mar. 12, 2014, at 71–78.)  And finally, as to the distance of the shell casings from Tomlin's body, there is no evidence in the record to support Rivera's bald assertion that a handgun is incapable for firing 69 yards. Additionally, all seven fired cartridge cases found at the scene were fired from the same gun, suggesting that whoever shot from 69 yards was in fact Tomlin's killer.  And as Judge Lloret noted, this evidence is corroborative of the theory that Rivera was firing at random and hit an unfortunate victim, a theory that is sufficient to convict him of third-degree murder as the jury did here.  (Doc. No. 44 at 27 n.9.)

In sum, the Court finds that Judge Lloret appropriately considered and weighed the evidence against Rivera in finding that he had failed to meet the prejudice component of *Strickland*.  The purported deficiencies relied on by Rivera are insufficient, either on their own or in aggregate to overcome the non-video evidence against him.  Thus, the Court will overrule Rivera's objections as to this claim.

* * *

The Court finds that any purported error by Rivera's counsel in failing to properly investigate the video or retain an expert was not prejudicial.  And since the Court finds that Rivera's claim fails at the prejudice portion of *Strickland*, the Court need no reach Rivera's objections as to the deficient performance portion of the test.  Therefore, the Court overrules objections related to his ineffective assistance claim, which includes objections I, III, IV, VI, VII, VIII, IX, XI, and XII, and dismisses this claim with prejudice and without an evidentiary hearing.[12]

---

[12] As noted above, in addition to the objections explicitly attacking Judge Lloret's conclusion as to the prejudice component of *Strickland*, Rivera makes numerous evidentiary objections.  This includes

### B.      Brady Violation

Rivera also argues that he is entitled to a new trial because the Commonwealth has failed to retain a copy of the composite videotape played at his trial.  (Doc. No. 38 at 9–11.)  This, he argues, violates his due process rights under *Brady*.  (*Id.*)  Judge Lloret recommended that the Court dismiss Rivera's *Brady* claim because (1) the compositive videotape was not exculpatory, (2) the Commonwealth gave Rivera's counsel a copy of the videotape months before his trial, and (3) Rivera was not prejudiced (since his counsel had the videotape).  (Doc. No. 44 at 24–25.)  Rivera objects to Judge Lloret's conclusions.  (Doc. No. 45 at 11, 15 (Objections X, XIII).)  Because the Court agrees with Judge Lloret's recommendation, it overrules Rivera's objections and dismisses his *Brady* claim with prejudice.

Under *Brady*, prosecutors cannot suppress information favorable to the defendant if that information is "material either to guilt or to punishment."  *Brady*, 373 U.S. at 87.  Thus, to succeed on his *Brady* claim, Rivera must show the following:  (1) that the composite videotape was favorable to his case, (2) that the Commonwealth suppressed it, and (3) that Rivera was prejudiced by the video's suppression.  *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 284–85 (3d Cir. 2016) (citations omitted).  As under the *Strickland* standard, the prejudice prong asks whether "the government's evidentiary suppression undermines confidence in the outcome of the trial."  *Id.* at 285 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (cleaned up)).

Rivera first argues that the Court should not consider the composite videotape "unless and until the Commonwealth produces it."  (Doc. No. 45 at 11.)  But the Commonwealth has

---

"object[ing] to the Andrea Harris testimony which supposedly authenticated footage from the missing composite videotape," "object[ing] to the Dunlap testimony which supposedly authenticated footage from the missing composite videotape" (Doc. No. 45 at 10 (Objection VIII)), and objecting to Dunlap being qualified as an expert because "there was no evidence that Dunlap was an expert in anything" (*id.* at 11 (Objection IX)).  The Court finds these objections confused, conclusory, and meritless.  They are therefore overruled.

produced the videotape on multiple occasions.  The Commonwealth first gave Rivera's counsel a copy of the videotape several months before his trial.  (N.T. Mar. 11, 2014, at 2–4.)  And the day before Rivera's trial, after Rivera's counsel told the state court that his copy of videotape did not work, the Court required Rivera and his counsel to watch the video in the courtroom on the prosecution's laptop and the Commonwealth subsequently gave Rivera a new copy.  (N.T. Mar. 10, 2014, at 178.)  Thus, as Judge Lloret found, the Commonwealth clearly did not suppress the videotape.[13]

Rivera also argues that "without the videotape, it is unreasonable to assume that the videotape was not exculpatory."  (Doc. No. 45 at 15.)  But at trial, Dunlap walked the jury through the video as it was played in sections.  (N.T. Mar. 12, 2014, at 124–151.)  The video showed Rivera, wearing acid-washed jeans, assault Thompson.  (*Id.* at 131–137.)  It then showed Rivera, several hours later and in the same jeans, firing two shots before fleeing in a car.  (*Id.* at 137–145.)  As the trial record shows, and as Judge Lloret noted, the videotape was "profoundly inculpatory."  (Doc. No. 44 at 25.)  Indeed, Rivera's suggestion that it was anything short of this is at odds with his argument that the video was the prosecution's "main evidence" at trial.  (Doc. No. 45 at 5.)  Because the Commonwealth did not suppress the videotape—which in any case was not exculpatory—the Court overrules objections X and XIII and dismisses Rivera' *Brady* claim with prejudice and without an evidentiary hearing.

---

[13] To the extent Rivera argues that notwithstanding the Commonwealth turning over the evidence at trial, he is entitled to relief because the Commonwealth did not turn over the video for his habeas petition, the Court finds his argument misguided.  The Supreme Court has made clear that "Brady does not apply in the post-conviction context."  *In re Bolin*, 811 F.3d 403, 408–09 (11th Cir. 2016); *Dist. Atty.'s Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68–69 (2009) ("[N]othing in our precedents suggest[s] that [*Brady*'s] disclosure obligation continue[s] after the defendant [is] convicted and the case [is] closed.").

### C.      Actual Innocence

As noted above, Rivera's amended memorandum also asserted a claim of actual innocence.  (Doc. No. 38 at 11–12.)  Judge Lloret recommends that the Court dismiss this claim because Rivera has not presented new evidence, as is required for an actual innocence claim.  (Doc. No. 44 at 25–27.)  Rivera did not object to this conclusion, and therefore we apply only clear error review.  *See Marsalis v. Pa. Dep't of Corr.*, 37 F.4th 885, 888 (3d Cir. 2022) (citation omitted) ("[A] losing party may forfeit an argument by not objecting to a magistrate judge's recommendation rejecting it.").  Here, the Court finds no clear error and agrees with Judge Lloret's analysis:  Rivera's claim fails because he has not presented any new evidence and instead, has presented his interpretation of the evidence at trial.[14]  *See Hubbard v. Pinchak*, 378 F.3d 333, 340 (3d Cir. 2004).

## IV.    CONCLUSION

For the reasons discussed above, the Court overrules Rivera's objections and adopts the R&R.  Rivera's claims are dismissed with prejudice and without an evidentiary hearing.[15]  An appropriate order follows.

---

[14] Rivera also objects to Judge Lloret's discussion of Rivera's procedural default (Objection II).  (Doc. No. 45 at 6.)  Because the Court has already determined that Rivera's procedural default does not bar habeas review, we find this objection baseless. (*See* Doc. No. 27 at 11–15.)  Finally, in his initial petition Rivera argued that his appellate counsel was ineffective for failing to raise the fact that his trial counsel did not object to several statements made by the prosecutor during opening and closing arguments.  (Doc. No. 1 at 9.)  Judge Lloret found that Rivera's trial counsel had objected to several statements made by the prosecutor.  (Doc. No. 44 at 2 n.2.)  In any case, Judge Lloret concluded that Rivera had waived his ineffective of assistance of appellate counsel claim because Rivera did not "argue this claim in either his initial brief or his reply to the Commonwealth's response."  (*Id.*)  The Court agrees with Judge Lloret's conclusions and dismisses Rivera's ineffective assistance of appellate counsel claim.

[15] The Court will not issue Rivera a certificate of appealability since Rivera has failed to make a "substantial showing of the denial of a constitutional right" such that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner." *Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 474 (3d Cir. 2017) (quoting 28 U.S.C. § 2253(c)(2) and *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).